**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **NOLA FINE ART, INC. & MICHAEL HUNT** | * | **CIVIL ACTION NO.: 13-4904** |
| **Plaintiff,** | * | **JUDGE: SARAH VANCE** |
| **Versus** | * | **MAGISTRATE: KAREN WELLS ROBY** |
| **DUCKS UNLIMITED, INC.** | * | |
| **Defendants.** | * | |

*** * * * * * * * * * * * * * * * * * * * * * * * ***

**PLAINTIFFS' OPPOSITION TO DUCKS UNLIMITED'S MOTIONS FOR SUMMARY JUDGMENT CONCERNING FRAUD AND UNFAIR TRADE PRACTICES [REC. DOCS. 39 and 40]**

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, NOLA Fine Art, Inc. and Michael Hunt, who respectfully submit this Opposition to defendant Ducks Unlimited, Inc.'s ("DU") "*Motion for Partial Summary Judgment on the Plaintiffs' Cause of Action for Fraud*" [Rec. Doc. 39] and "*Motion for Partial Summary Judgment on the Plaintiffs' Cause of Action Under the Louisiana Unfair Trade Practices Act*" [Rec. Doc. 40]. Plaintiffs respectfully request that Ducks Unlimited's motion be denied for the reasons discussed in detail below.

**FACTUAL BACKGROUND**

The "Cat Island Project" that is the subject of the instant suit was an attempt to raise money following the BP oil spill to help restore Cat Island and its role as an important nesting ground for the Brown Pelican.[1] The oil spill had devastated Cat Island, the brown pelican

[1] See Hunt Declaration, attached as Exhibit A.

population, and their fragile nesting areas. Pelicans were soaked in oil and the future of the brown pelican in Louisiana was precarious.

Renowned artist Michael Hunt[2] and NOLA Fine Art were commissioned by Ducks Unlimited to produce limited edition prints to help raise funds for the project. Although the goal of the project was to help raise money for Cat Island, with a portion of the proceeds earmarked for same, this was also a commercial endeavor for Plaintiffs. Hunt dedicated months of his valuable time to the project and maintained sole responsibility for the substantial costs and expenses associated with the project, including painting, producing, manufacturing, framing, and shipping the limited edition lithographs. In exchange, Plaintiffs were to receive a percentage of the profits from the sale of the prints, as well as profits from framing.[3]

In addition to the substantial amount of national publicity it would and did receive in connection with the project, Ducks Unlimited was also to receive 20% of the proceeds for the sale of the artwork for the purpose of helping to restore Cat Island. This was a win-win for Ducks Unlimited – it received free advertising, was able to raise and contribute a substantial sum to helping restore Cat Island, and had no out-of-pocket expenses of its own. Ducks Unlimited's sole obligations under the parties' agreement was that it was to actively and regularly advertise the prints to its over 650,000 members and turn over a portion of its percentage to the restoration of Cat Island.[4]

Local and national public figures were motivated to assist as Cat Island reeled from the tragic effects of the BP Oil Spill. Governor Jindal agreed to sign the "Governor's edition" of the

---

[2] Hunt has done portraits of Pope John Paul II that reside in the Vatican's art collection and William Jefferson Clinton that reside in the White House collection. He has been involved in several projects involving various celebrities, athletes, and charitable endeavors. http://www.nolafineart.com/photos/

[3] See Exhibit A.

[4] See Exhibit A; Exhibit B, p. 3.

print and his office even penned and signed letters to various celebrities seeking their support of the project.[5] Celebrity Kevin Costner also agreed to sign a version of the print. In addition, a short promotional film for the artwork was produced which was narrated by John 'Spud' McConnell.[6]

NOLA Fine Art's point of contact with Ducks Unlimited was Robert T. Garrity, Jr., the organization's state chairman in Louisiana. John Newman, Ducks Unlimited's President, was also involved in the commissioning of the prints. The prints were completed and the project proceeded forward towards a grand unveiling at the Louisiana State Chapter's 2012 convention in New Orleans, Louisiana. Various media outlets also got the word out about the Cat Island Project. For instance, WWL did a story with footage from Cat Island with several Ducks Unlimited members talking about the island, the damage from the BP Oil Spill, the Cat Island prints, and the efforts to restore the island.[7]

The kickoff to the campaign to market the prints for sale was the DU State convention in Louisiana set for July 19-21, 2012. DU consistently told the public that the Cat Island Print was their print and that it had been "commissioned by DU President John Newman and DU state Chairman Robert Garrity."[8]

As noted, DU committed to market the print to its members, and the film, The Cat Island Project, was shown at DU's state convention. The film begins with bold lettering that states "Ducks Unlimited Presents" and goes on to tell the compelling story of how the island and the

[5] The letters from the Governor's Office discuss the BP Oil Spill and the effects of various hurricanes (including Hurricane Isaac) and then concluded: Governor Jindal recently hand-signed a special edition lithograph featuring some of our beautiful shorebirds whose natural habitat is these precious coastal wetlands. Proceeds from this art will progress coastal/wetlands habitat restoration ***in Louisiana through Ducks Unlimited***. (Emphasis added). See Governor's letters, attached as Exhibit C.

[6] As of even date, the promotional film may be found at the following link: http://youtu.be/UvXyFa3pe-c. See also: http://www.tellyawards.com/winners/list/?l=treetop+media&event=14&category=3&award=B

[7] http://bcove.me/ovreafyh

[8] See DU August 2012 Newsletter, attached as Exhibit E. Moreover, 67 prints were sold before DU sabotaged the project. See Letter from CPA, attached as Exhibit F.

brown pelican population were ravaged by the BP Oil Spill. Although DU never fulfilled its obligations to advertise the work nationally, it did do some minor local advertisements. These advertisements stated that:

> The "Cat Island Project" print was commissioned by DU President John Newman and DU State Chairman, Robert Garrity and was unveiled at the 2012 Louisiana DU State Convention in new Orleans, LA. These Prints are now available for sale with a portion of the proceeds going towards the restoration of the Cat Islands, a nesting habitat of the Brown Pelican.[9]

As the parties continued to work together, it became clear that DU was reneging on their obligations to advertise the work to all of its members. They would not return calls, would not send out promised email blasts, and refused to confirm details on where the proceeds should be sent or how they would be used. Michael Hunt became very concerned. He called a meeting on August 20, 2012 at a local restaurant to try and clear the air. The meeting consisted of Michael Hunt, Robert Garrity, and P.J. Hahn. DU's motivations were made painfully clear at this meeting.[10]

The candor at this meeting is in stark contrast with DU's "after-the-fact" explanations in this litigation for why it refused to fulfill its contractual obligations.[11] DU's demands and motivations for killing the project were fully crystallized and explained. DU evidently contacted BP about the project and was told by BP to remove any mention of "BP" or the "BP Oil Spill" from the advertising materials.[12] Ducks Unlimited's State Chairman testified that, upon seeing the promotional video that specifically referenced the BP oil spill, Ducks Unlimited's C.E.O., Dale

---

[9] See Exhibit E, p. 8.
[10] See Exhibit A.
[11] See La Madeleine Transcript, attached as Exhibit D. It is important to note that this meeting took place before Hurricane Isaac.
[12] According to Garrity, DU was in line to receive 1 to 5 million dollars from BP. See Exhibit D, DU0098.

Hall, ordered Garrity to splice the video and remove any references to BP or the BP oil spill.[13] Garrity further testified that:

> When I talked to Mr. Hall, Mr. Hall told me that DU, Inc. was going to the BP foundation, and that he did not want to have something on our national website that referred to the BP oil spill when, in fact, all the litigation was titled 'Deepwater Horizon.'[14]

Although Garrity portrayed this instruction as an attempt to more accurately conform with the litigation caption by instead calling it the 'Deepwater Horizon' spill, the truth is that Ducks Unlimited didn't want to ruffle any feathers with BP. During the meeting between Hunt, Hahn, and Garrity, Garrity made the following candid statement:

> Okay, here's the deal. It's all about sensitivities. Yeah. The BP foundation has been very generous to Ducks Unlimited. And BP foundation is going to kick in between a million and five million outta all this money they have to come up with. . . . . DU is going to be on the receiving end of a bunch of it.[15]

Garrity further testified that his concern was with the project "interfering with Mr. Hall and DU, Inc.'s ability to go to [BP] and get money that they were spending to rebuild their image."[16] No doubt upset over the impact that images of oil-drenched pelicans would have on BP, DU then sought to downplay the plight of the brown pelicans.

Faced with the choice of continuing with the project as agreed to, or reneging and accommodating BP, DU sided with BP. To DU this was ostensibly done to "be more accurate" or more likely, as a means of placating a potential donor at the expense of the participants in the Cat Island Project. To Michael Hunt, NOLA Fine Art, and other Cat Island Project participants, this

---

[13] See Exhibit G, p. 118.
[14] See Exhibit G, p. 114.
[15] See Exhibit D, DU098.
[16] See Exhibit G, p. 125.

was something more egregious. It was an attempt to whitewash BP's involvement in the spill and deceive the public as to the very purpose of the project.[17]

To make matters worse, DU made clear that the project money that it advertised as going to restore Cat Island was never intended to go there. Instead, it was to go to DU's "general fund," where there was no guarantee that it would even go to helping Louisiana at all. Despite advertising that the money was to go to restore Cat Island, Garrity testified in his deposition that DU had full discretion to spend such funds anywhere it sought fit – from Canada to Mexico.[18] DU apparently had no concern that the Cat Island Project and the representations made to the public formed any kind of obligation on their part.

With no advertising or support from DU, despite its public assurances to the contrary, the project understandably withered and died. More concerned with protecting BP's image than upholding its contractual obligations, DU is apparently wholly unconcerned about the impact its decisions and misrepresentations have had on anyone but itself.

**STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir.2008). In evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party.

[17] See Exhibit A.
[18] See Exhibit G, p. 107.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If factual issues or conflicting inferences exist, the court is not to resolve them; rather, summary judgment must be denied. *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1016 (5th Cir. 1990) *amended*, 919 F.2d 992 (5th Cir. 1990) *and certified question answered*, 587 So. 2d 273 (Miss. 1991). A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Hunt v. Rapides Healthcare Sys.*, LLC, 277 F.3d 757, 762 (5th Cir. 2001).

## LAW AND ARGUMENT

## I. LOUISIANA UNFAIR TRADE PRACTICES ("LUTPA')

Ducks Unlimited makes three arguments in opposition to Plaintiffs' unfair trade practices claims. First, Ducks Unlimited argues that Plaintiffs cannot maintain a LUTPA claim against it because the parties are not direct competitors. Second, Defendant argues that the instant transaction involves "business consumers" as opposed to "consumer transactions," therefore rendering LUTPA inapplicable to this case. Finally, Ducks Unlimited claims that Plaintiffs cannot show that Ducks Unlimited engaged in any "deceptive or unfair trade practices." Ducks Unlimited is mistaken on each point.

### *A. Plaintiffs have sufficient standing to bring the instant claims against Defendant.*

As noted above, Defendant's primary argument is that Plaintiffs have no standing to bring a LUTPA claim against Ducks Unlimited because the parties are not direct competitors and that "LUTPA provides a cause of action ***only*** for direct consumers and business competitors."[19]

[19] Plaintiffs note that Louisiana courts interpreting this statute have held that "[c]laims under LUTPA are **not** limited to consumers and business competitors, but are available to any person who suffers any ascertainable loss as a result of violations of the statute." *See, e.g., Haygood v. Dies*, 127 So.3d 1008, 1012 (La.App. 2 Cir. 11/20/13) (emphasis added); *Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co.*, 2014 WL 4923074 (La.App. 4 Cir. 10/1/14). Regardless, the Court need not reach the issue of whether parties must be in direct competition to maintain a LUTPA claim because,

(emphasis in original) (Rec. Doc. 40-3, p. 3). Defendant then claims, without citing to any support, that the parties are "clearly" not business competitors because Plaintiffs are in the business of selling artwork and Defendant is a nonprofit dedicated to wetlands and waterfowl conservation. Defendant's own website, however, belies its claim that it is not a competitor because it does not sell artwork.

According to Ducks Unlimited's own words, "[f]or more than 35 years, wildlife art has been a key ingredient to the success of Ducks Unlimited fund-raising events. DU's art program has raised more than $35 million in support of continental wetlands and waterfowl conservation. In addition to the exceptional art, DU events also feature decoys, sculptures, and other sporting collectibles."[20] Ducks Unlimited further boasts that, "those who have attended a Ducks Unlimited fundraising event know that this is the place to be for folks seeking high-quality wildlife artwork."[21] And if this were not enough, Ducks Unlimited also claims to be the "largest publisher of wildlife art and art related items."[22]

Numerous courts interpreting the Louisiana Unfair Trade Practices Act have held that a "business competitor is a person who actually or potentially engages in business that competes directly or indirectly with the plaintiff." *See, e.g., Total Sleep Diagnostics, Inc. v. United Healthcare Ins. Co.*, 2009 WL 152537 (E.D. La. Jan. 21, 2009), citing *Tubos de Acero de Mexico v. American Int'l Investment Corp.*, 292 F.3d 471, 480 (5th Cir. 2002). Here, there is little question that the parties *actually* engage in business that *directly* completes with one another sufficient to satisfy LUTPA's standing requirement.

***B. The subject artwork was sold as a "consumer transaction" for purposes of LUTPA.***

---

as further explained herein, the parties are in fact direct competitors.

[20] Exhibit H, p. 2

[21] Exhibit I.

[22] Exhibit J.

Defendant next argues that Plaintiffs are "business consumers" and, as such, cannot maintain a cause of action under LUTPA. Defendant cites to *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.* to say that LUTPA only concerns consumer transactions, "the subject of which transaction is primarily intended for personal, family, or household use." 922 F.2d 220 (5th Cir. 1991). In *Wang Labs.*, the plaintiff was a medical clinic who sued the seller and servicer of its computers for destroying its computers' hard disks during repairs. *Id.* at 222-23.

In the instant lawsuit, however, the "subject of [the] transaction" for the LUTPA claim is the Cat Island lithographs. Unlike in *Wang Labs.*, this artwork was never intended to be sold by Defendant to Plaintiff as a behind-the-scene business transaction. Instead, the artwork was advertised and sold to Ducks Unlimited members and the community at large. There is no question that the artwork was intended for personal, family, or household use.

Moreover, even if the subject artwork that was advertised and sold to the general public were somehow considered to be business transactions, this is not dispositive of the issue. In *Barrios v. Associates Commercial Corp.*, Louisiana's First Circuit Court of Appeal, found that LUTPA is not limited to transactions involving household items; rather, the statute establishes two separate categories of regulated activity: one category is the "consumer transaction" of La.R.S. 51:1402(3) covering natural persons in trade or commerce for personal or household use; the other is the "consumer interest" of La.R.S. 51:1402(2) covering the entire field of the economic welfare of a consumer, which is defined in the statute as any person buying an unlimited array of goods and services. 481 So.2d 702 (La.App. 1 Cir.1985). *See also Idest-Guidry, Ltd. V. Key Office Equip., Inc.*, 997 So.2d 796 (La.App. 3 Cir. 11/5/08) (affirming trial court's finding that LUTPA is not limited to "consumer transactions.").

As the court in *Barrios* explained:

> Counsel finds apparent refuge in the wording of § 1402(3) which defines a consumer transaction as "... any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use." This interpretation would seem to limit the law's coverage to minor items used "around the house," such as toasters, blenders, power mowers or window-mounted air conditioners.
>
> We find this to be far too narrow a reading of the legislation. § 1402(1) defines "consumer" as "any person who uses, purchases, or leases goods or services." § (2) defines "consumer interest" as "those acts, practices, or methods that affect the economic welfare of a consumer." § (8) defines "person" as "a natural person, corporation, trust, partnership, incorporated association, and any other legal entity." § 1405 says, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of *any trade or commerce* are hereby declared unlawful." (Emphasis added).

*Barrios*, 481 So.2d at 704, 705.

Based on the foregoing, it is evident that the artwork that is the subject of the sales transactions was a "consumer transaction," the subject of which was intended for personal, family, or household house. Even if this were not the case, however, Defendant could still be in violation of LUTPA if it were to have engaged in unfair or deceptive acts in the conduct of its trade. As discussed in depth in the next section, there is little doubt that Ducks Unlimited has engaged in unfair or deceptive acts in its advertising and business practices concerning this artwork.

***C. Ducks Unlimited has engaged in deceptive or unfair trade practices sufficient to support a LUTPA claim.***

Ducks Unlimited's final argument on this issue is that Plaintiffs have no cause of action under LUTPA because Plaintiffs have not alleged any facts to show that Defendant engaged in any deceptive or unfair trade practices. Consequently, Defendant reasons, this is therefore just a simple breach of contract claim, which is not actionable under LUTPA.

In support of this argument, Defendant cites to *Turner v. Purina Mills, Inc.*, which notes that LUTPA "does not provide an alternate remedy for simple breaches of contract." 989 F.2d

1419, 1422 (5th Cir. 1993). This lawsuit, however, is not just about a "simple" breach of contract. In a subsequent opinion from the Fifth Circuit, the court clarified that a LUTPA claim may in fact be based on the same set of facts as a breach of contract claim so long as there are other allegations to support such a claim, such as allegations of "fraud, misrepresentation, or deception," all of which were absent from the *Purina Mills* case. *See Chem. Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993) (affirming jury verdict on LUTPA claims where the facts with respect to plaintiff's LUTPA claims were the same as those before the jury on the plaintiff's breach of contract claim).

La. R.S. 51:1409(A) sets forth a cause of action for "any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act. . . ." While the statute does not specify particular violations, jurisprudence has established that, "a practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious" *Levine v. First Nat. Bank of Commerce*, 948 So.2d 1051, 1065-1066, (La.12/15/2006). Acts constituting unfair or deceptive trade practices are not specifically defined but are determined on a case-by-case basis. *See, e.g., Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co.*, 2014 WL 4923074 (La.App. 4 Cir. 10/1/14); *Johnson Const. Co. v. Shaffer,* 46,999, p. 5 (La.App. 2 Cir. 2/29/12), 87 So.3d 203, 208; *Tyler v. Rapid Cash, LLC,* 40,656, p. 9 (La.App. 2 Cir. 5/17/06), 930 So.2d 1135, 1140. A practice is unfair under LUTPA when "it offends established public policy and when the practice is unethical, oppressive, unscrupulous or substantially injurious." *Indest-Guidry, Ltd. v. Key Office Equip.*, Inc., 2008-599 (La. App. 3 Cir. 11/5/08); 997 So. 2d 796, 806; *writ denied*, 2008-2851 (La. 2/6/09); 999 So. 2d 782. As a leading treatise on unfair competition law recognizes: "The possibilities of acts constituting unfair

competition are limited only by the inventiveness of business people embroiled in the pressures of competitive rivalry." 1 McCarthy on Trademarks and Unfair Competition § 1:18 (4th ed.).

In the instant suit, Plaintiffs allege that Ducks Unlimited engaged in unethical, unscrupulous and substantially injurious behavior in addition to breaching the contract. More specifically, Plaintiffs have alleged that Ducks Unlimited advertised to the public that it was raising funds for the recovery of Cat Island, though it had no intention of ever donating that money to the recovery; that Ducks Unlimited's termination of the contract was motivated by its concerns for protecting the image of BP, which had promised to funnel millions to the organization; and that Ducks Unlimited deceived Plaintiffs by claiming it would actively promote the artwork to its over 650,000 members, but never intended to actually do so. Each of these claims is addressed below.

**i. Ducks Unlimited advertised to the public that it was raising funds for the recovery of Cat Island, though it had no intention of ever donating that money to the recovery.**

Plaintiffs have alleged in this lawsuit that the parties entered into a verbal agreement wherein Plaintiffs were to create the subject artwork for the purpose of raising funds to help with the restoration of Cat Island. Pursuant to this agreement, Ducks Unlimited would receive 20% of the proceeds of the sales which it would then use to help restore Cat Island.

It is beyond question that the goal of the project was to help raise money to restore Cat Island due to the BP oil spill. Ducks Unlimited's own advertising states as follows:

> [T]ragically, in 2010, the BP Horizon oil spill struck the Gulf Coast. The nation watched as millions of barrels of oil made its way onto the coastline and into marshes and waterways. [. . .] With no plans to rebuild the Cat Islands and the slow pace of the BP settlement, the islands future appears bleak. Something must be done. [. . .]
>
> Using Hahn's photographs as inspiration, artist Michael Hunt captured the birds on

> Cat Island in a magnificent painting. Prints of this painting were commissioned by Ducks Unlimited (D.U. President, John W. Newman and D.U. State Chairman, Robert Garrity, Jr.) to commemorate their 75th anniversary. A portion of the proceeds from the sale of the prints will go towards the restoration of the Cat Islands.[23]

As noted, the plan was to raise the money through the sale of the lithographs, with Ducks Unlimited sending up to 20% of the proceeds to Cat Island.[24] However, despite claiming in its advertising materials that the money was earmarked to restore Cat Island, Ducks Unlimited never intended to donate the money to Cat Island.

During a recorded meeting between the Michael Hunt, P.J. Hahn, and Ducks Unlimited's State Chairman, Robert Garrity, Jr., Hunt asked for an answer to potential media inquiries concerning how much of the money would go to restoring Cat Island. In response, Hahn stated that, "I just tell them a portion of the proceeds go to, they don't know enough to . . . they don't . . . nobody gets into the weeds on this thing. It's a good project. Nobody's asking, nobody gets deep, deep down in the weeds, you know, that a portion of the proceeds go to, to, to actually, it goes to coastal restoration, it doesn't go to the island." Garrity then agreed, repeating Hahn's claim that the funds were not intended to go to Cat Island: "It goes to coastal restoration."[25]

This sentiment was later repeated by Ducks Unlimited's representatives during their depositions. Ducks Unlimited's former State Chairman testified as follows:

> Q: And Ducks Unlimited's portion of that, there was no obligation for them to donate to Cat Island?
> A: Not to Cat Island, no.[26]

Ducks Unlimited's current State Chairman, Michael Patterson, stated as follows:

> Q: And if you do raise money in connection with a specific project, do you

---

[23] Exhibit K.
[24] Exhibit A, ¶ 8.
[25] Exhibit D, DU-0111-12.
[26] Exhibit G, p. 110.

think the money that you raise ought to go to that specific project?
A: I don't know that that's a determination for me to make.
Q: Who would make that determination?
A: I guess who's ultimately in charge of the disposition of the funds.
Q: And who would that be; Ducks Unlimited, Inc.? I think you said they're the ones that control the funds. Right?
A: Ultimately, the money that goes to [Ducks Unlimited's headquarters in] Memphis is – they're the ones that delegate money to go to different projects.

. . .

Q: . . . I'm asking you, as state chairman, when you go fundraise for specific projects, don't you feel an obligation to give that money raised to those projects?

(Objection)

Q: Did you have an answer?
A: I really don't have an answer.[27]

Finally, Ducks Unlimited's President who commissioned the artwork, testified as follows:

Q: What was your understanding of where the funds would go from, let's say, out of the Cat Island Project prints?
A: My understanding is that Ducks Unlimited would receive – I guess the maximum amount would've been $74,000 from the sale of the Ducks Unlimited prints.
Q: Okay. And would that have had any conditions associated with it?
A: Not to my knowledge.
Q: You know there was a Cat Island project and a great deal of literature about restoring Cat Island –
A: Uh-huh (nods head affirmatively)
Q: And it's your testimony that your understanding was that the $74,000 was unfettered general fund money?
A: Yes.[28]

* * *

Q: You have no concern that there's a project with Ducks Unlimited's logo on it that mentions a specific island and yet the funds are not going to restore that Island?

(Objection)

A: To answer your question, I would say Ducks Unlimited raises millions of dollars and invests millions of dollars in the highest priority areas of coastal restoration in Louisiana. So I am perfectly fine with the work that Ducks Unlimited is doing in the restoration of coastal Louisiana.[29]

---

[27] Exhibit L, pp. 71, 74-75.
[28] Exhibit M, pp. 128-29.
[29] Exhibit M, p. 146.

In short, despite advertising to the public that it was raising funds for the restoration of Cat Island, the truth is that Ducks Unlimited never intended to send a penny of the money raised to Cat Island. Instead, Ducks Unlimited misled Plaintiffs and the public in raising funds for a specific project when its only plans for the funds was to line the coffers of its general fund.

Ducks Unlimited's response is to say that it was *Plaintiffs'* obligation to donate money to the restoration of Cat Island, not Ducks Unlimited. Defendants have taken the inexplicable position that they were entitled to 20% of the proceeds of the artwork without any restrictions or obligations. Defendant's argument rests on an unsigned early draft of an agreement between the parties, an agreement that was subsequently amended on this point. If Defendant's position is to be believed, then why did its State Chairman simply say this when specifically questioned about how the funds were to apportioned to Cat Island? Instead, stood firm on the fact that the funds would go to "coastal restoration," though not to the restoration of Cat Island.[30]

Although Ducks Unlimited may argue that it had no obligation despite its public and private statements concerning the funds, the aforementioned testimony and evidence makes clear that there are simply too many issues of fact making this issue inappropriate for summary judgment.

**ii. Ducks Unlimited deceived Plaintiffs by claiming it would actively promote the artwork to its over 650,000 members, but never intended to actually do so.**

Ducks Unlimited's role in the instant agreement with Plaintiffs was that it would actively and regularly promote the artwork to its over 650,000 members. P.J. Hahn, a third-party who was present during negotiations, wrote the following email to Ducks Unlimited State Chairmen Michael Patterson and Robert Garrity:

[30] Exhibit D, DU-0111-12. Furthermore, Defendant has attempted to evade its liability by claiming that Cat Island was completely destroyed in Hurricane Isaac. However, Ducks Unlimited's State Chairman made this statement on August 20, 2012, which was *prior* to Hurricane Isaac.

> As per our conversation, when Michael Hunt and I first spoke with Robert [Garrity] about this project we were enthused about Ducks Unlimited's involvement and the ability to reach out to 650,000 members. **Our agreement was to promote the project through the media to jump start the interest, and then get email blasts to the DU members' (All members) to produce sales.** Without regular email blasts to DU members, the branding of DU on the print really means nothing to us, as it does not generate sales. To date we have sold very few prints, other than when we got the first plug(s) from the media. To be successful, this needs to be put in front of the members for the next 6-8 weeks, and obviously emails are the easiest, least expense means offering the best results. I've addressed your concerns naming "BP" in the advertising of the print and Tammy has already taken that verbiage out. I really need a commitment from DU to getting out these emails, and I'm hoping you can run this up the chain and get us that answer soon.[31]

Hahn's understanding of Ducks Unlimited's contractual obligation to advertise the artwork mirror those of the Plaintiffs.[32]

For its part, however, Ducks Unlimited claims that it never intended to advertise the works nationally. In a recorded conversation that was prompted by Ducks Unlimited's continued refusal to advertise the work, Garrity stated as follows: "[W]e can do web blasts from the state. We can't do 'em nationally. National doesn't wanna do web blasts because people start deleting 'em, and they get, they get pissed off. . ."[33] In his deposition, Garrity was more blunt and definitive in his position that Ducks Unlimited never intended to advertise the work to its members: "DU does not send out national e-mail blasts hawking any product."[34]

As noted in the following section, Ducks Unlimited's admitted motivation for killing the agreement through non-advertising was entirely motivated by its desire to protect BP. In correspondence from Ducks Unlimited's 2012 State Publicity Chairman (and current State Chairman), Michael Patterson, Patterson pushed Plaintiffs to remove "BP" from all advertising

[31] Exhibit B, p. 3.
[32] Exhibit A, ¶ 8.
[33] Exhibit D, DU-126.
[34] Exhibit G, p. 122.

materials. Patterson then indicated that any advertising to all Ducks Unlimited members was contingent upon Plaintiffs agreeing to whitewash BP's role in the oil spill: "Correcting this may enhance our efforts in regard to additional exposure."[35]

**iii. Ducks Unlimited's failure to perform under the contract was motivated by its improper concerns for protecting BP, which had promised to funnel millions to the organization.**

It is also plainly evident from the evidence and testimony that, despite advertising that the Cat Island print was a response to the BP oil spill, Ducks Unlimited refused to comply with its obligations to advertise the artwork because it did not want to risk offending BP, who Ducks Unlimited was actively courting for money.

As noted above, the agreement with Ducks Unlimited required it to do regular email blasts to its over 650,000 members. However, Ducks Unlimited refused to fulfill its end of the agreement because of concerns that doing so would upset BP. Although the very purpose of the project was a response to the BP oil spill, Ducks Unlimited immediately ordered that "BP" and "BP oil spill" be scrubbed from its website and removed from the artwork's promotional video. Even more alarming is the fact that this edict came straight from the top – Ducks Unlimited's C.E.O., Dale Hall.

Ducks Unlimited's State Chairman testified that, upon seeing the promotional video that specifically referenced the BP oil spill, Hall ordered Garrity to splice the video and remove any references to BP or the BP oil spill.[36] Garrity further testified that:

> When I talked to Mr. Hall, Mr. Hall told me that DU, Inc. was going to the BP foundation, and that he did not want to have something on our national website that referred to the BP oil spill when, in fact, all the litigation was titled 'Deepwater Horizon.'[37]

[35] Exhibit B, p. 2.
[36] Exhibit G, p. 118.
[37] Exhibit G, p. 114.

Although Garrity portrayed this instruction as an attempt to more accurately conform with the litigation caption by instead calling it the 'Deepwater Horizon' spill, the truth is that Ducks Unlimited didn't want to ruffle any feathers with BP. During the meeting between Hunt, Hahn, and Garrity, Garrity made the following candid statement:

> Okay, here's the deal. It's all about sensitivities. Yeah. The BP foundation has been very generous to Ducks Unlimited. And BP foundation is going to kick in between a million and five million outta all this money they have to come up with. . . . . DU is going to be on the receiving end of a bunch of it.[38]

Garrity further testified that his concern was with the project "interfering with Mr. Hall and DU, Inc.'s ability to go to [BP] and get money that they were spending to rebuild their image."[39]

Ducks Unlimited advertised and induced others to participate in the project as a response to the BP disaster, yet it quickly backpedaled and killed the deal through its failure to advertise when BP's concerns were brought to its attention. As Garrity succinctly put it, "They're trying to put up money to rebuild their image and, and, so what they asking is, 'Look, just don't piss in my face.'"[40] Had Ducks Unlimited been less concerned about deceiving the public in order to help BP's image and more concerned about fulfilling its public and private statements about the BP spill and its own advertising obligations, the instant lawsuit would never have been necessary.

## II. **FRAUD**

The Louisiana Supreme Court has held that, "there are three basic elements to an action for fraud against a party to a contract: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially

---

[38] Exhibit D, DU-098.
[39] Exhibit G, p. 125.
[40] Exhibit D, DU-104.

influencing the victim's consent to (a cause of) the contract." *Trotter v. Charles M. Fife, Jr. & Assocs.*, LLC, 36 So.3d 426 (La.App. 3 Apr 28, 2010) (citing *Shelton v. Standard/700 Assocs.*, 798 So.2d 60 (La. 2001)).

As noted in the previous sections, Plaintiffs allege that Ducks Unlimited engaged in unethical, unscrupulous and substantially injurious behavior through its misrepresentations to Plaintiffs and the public. More specifically, Plaintiffs have alleged that Ducks Unlimited misrepresented to Plaintiffs and the public that DU was raising funds for the recovery of Cat Island, though it had no intention of ever donating that money to the recovery (Section I.C.i., above) and that Ducks Unlimited deceived Plaintiffs by claiming it would actively promote the artwork to its over 650,000 members, but never intended to actually do so (Section I.C.iii., above). Both of these sections are incorporated by reference as if fully set forth herein. These sections satisfy the first element of a contractual fraud claim.

The next element, that the intent of the misrepresentation was to obtain an unfair advantage, has also been met. At the outset, it should be noted that Louisiana courts have made plain that "the circumstantial evidence that is usually necessary to prove intent requires the trier of fact to choose from competing inferences, a task that is not appropriate in a summary judgment proceeding. Summary judgment is appropriate only if there is no factual dispute as to intent." *Harris v. Dunn*, 48 So.3d 367, 45,619 (La.App. 2 Cir. 9/22/10). The foregoing sections make clear that DU had no intention of donating the money it received to Cat Island. Instead, and contrary to its claims that a portion of the funds would go to help restore Cat Island, DU sought to use such money instead for its "general fund."[41] Moreover, it is also evident from the evidence and testimony that DU misrepresented to Plaintiffs that it would advertise the artwork to all of its

[41] Exhibit M, p. 129.

members due to its desire not to interfere "with Mr. Hall and DU, Inc.'s ability to go to [BP] and get money that they were spending to rebuild their image."[42]

Finally, there is no question that DU's misrepresentations influenced the Plaintiffs consent to the agreement. For the project to succeed, it required DU to comply with its promise to promote the work. This was confirmed by both Hahn and Hunt.[43] Moreover, DU's decision not to donate any of the money that it had promised to Cat Island would undeniably adversely affect Plaintiffs' reputation and ability to attract celebrity talent for future such projects.[44]

For the foregoing reasons, Defendants' motion for summary judgment on this issue should be denied.

**CONCLUSION**

Ducks Unlimited's actions have harmed and continue to harm Plaintiffs. There is at least a genuine issue of material fact as to each of Plaintiffs' claims against Ducks Unlimited, and they should be allowed to stand. For these reasons, NOLA Fine Art, Inc. and Michael Hunt respectfully request that the Court DENY Defendant's motions for summary judgment as to fraud and unfair trade practices.

[42] Exhibit G, p. 125.
[43] Exhibit A, ¶ 8; Exhibit B, p. 3.
[44] Exhibit A, ¶¶ 4, 8, and 14.

Respectfully submitted,

/s/*Brad E. Harrigan*
Brad E. Harrigan (La. Bar No. 29592)
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, Louisiana 70130
Telephone: (504)568-1990
Facsimile: (504)310-9195
E-Mail: bharrigan@lawla.com

And

JESSE B. HEARIN, III (Bar No. 22422)
ATTORNEY AT LAW
1009 Carnation Street, Suite E
Slidell, Louisiana 70460
Telephone: (985)639-3377
E-mail: jbhearin@hearinllc.com

**Counsel for NOLA Fine Art, Inc. and Michael Hunt**

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2015, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

*/s/ Brad E. Harrigan*
Brad E. Harrigan